UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/2/12

------------------------------------------------------------X

INESSA LEONTYEVNA BEACH,          :

          Plaintiff,          :

      -v-          :

COMMISSIONER OF SOCIAL SECURITY,          :

         Defendant.          :

------------------------------------------------------------X

11 Civ. 2089 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Plaintiff Inessa Leontyevna Beach brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") finding her ineligible for both Supplemental Security Income ("SSI") disability benefits and widow's insurance benefits as of September 30, 2009.[1]  Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  In his papers, the Commissioner contends that the ALJ's decision is supported by substantial evidence.  In hers, Beach argues that the administrative law judge ("ALJ") erred as a matter of law by (1) failing to develop the record at the hearing; (2) providing a vocational expert with an incomplete hypothetical; and (3) failing to accord the proper weight to the opinions of her treating physicians.

For the reasons discussed below, the Court concludes that the ALJ's decision is free of legal error and supported by substantial evidence in the record.  Accordingly, the Court grants the Commissioner's motion for judgment on the pleadings and denies Plaintiff's cross-motion.

---

[1]    It appears from a document attached to Beach's complaint that she filed a new claim for SSI benefits on April 17, 2010, and began collecting such benefits as of January 2011 (backdated to May 2010).  Thus, the only thing at stake in this case is whether Beach was entitled to SSI benefits before May 2010 or to disabled widow's insurance benefits.

## PROCEDURAL HISTORY

On April 20, 2008, Beach filed an application for disabled widow's benefits.  (AR 88).[2]

Ten days later, she filed another application for SSI disability benefits.  (*Id.*).  In both

applications, Beach alleged she was disabled as of January 1, 1995.  (*Id.*).  On July 28, 2008,

both claims were denied on initial administrative review.  (AR 132-36, 138-41).  At Beach's

request, a hearing was held before an ALJ on September 10, 2009; although Beach is represented

by counsel before this Court, she appeared *pro se* at the hearing.  (AR 142-44, 97-129).  At the

hearing, the ALJ considered, among other things, the testimony of Beach; a vocational expert,

Miriam Green; and two medical experts, Dr. Joseph Vitolo (a psychiatrist) and Dr. Allan Levine

(an orthopedist).  (AR 97-129).  On September 30, 2009, the ALJ, considering the case *de novo*,

determined that Beach was not disabled and therefore not eligible to receive benefits.  (AR 85-

96).  On January 25, 2011, the Appeals Council denied Beach's request to review the ALJ's

decision, thus rendering it the final decision of the Commissioner. (AR 1-3).  *See Brown v. Apfel*,

174 F.3d 59, 61 (2d Cir. 1999).

## BACKGROUND

The following facts are taken from the administrative record and are undisputed.  Beach

was born in Moscow, Russia, in October 1956, and is fluent in both English and Russian.  (AR

106, 108).  She married in February 1979 and came to the United States in October of that year

as a lawful permanent resident.  (AR 106, 188, 190).  In the 1990s, she and her husband, Leslie

Lloyd Beach, separated, and he died in 1998.  (AR 101, 178).  Beach has been homeless on and

off since the early 1990s and continuously since 2000.  (AR 178).  In the years prior to the ALJ

hearing, she had occasional "off the books" jobs (for example, cooking), but her last "on the

---

[2]      "AR" refers to the administrative record filed by the Commissioner as part of his answer.

books" job was in 1993 working as a waitress.  (AR 109-10, 181).  She worked as a dispatcher for a car service in 1992.  (AR 181).  According to Beach, she became unable to work because of her disability on January 1, 1995.  (AR 181).

## A.  Beach's Testimony and Statements

At the September 10, 2009 hearing, Beach testified that she suffers from joint pain — mostly in her feet, but also in her hips and, more recently, in her elbow.  (AR 110, 112).  She said the pain increases the longer she stands and that she cannot sit for more than two or three hours at a time before experiencing numbness in her hip and in her extremities.  (AR 110-11).  She stated that she could probably stand for two to three hours, but not without effort (AR 111), and that she could walk ten to twenty blocks at most.  (*Id.*).  Beach further testified that, while she can still lift things, she could no longer carry weight well (AR 111-12), and that a rheumatologist had told her she had carpal tunnel syndrome in her hands.  (AR 113).

The ALJ asked Beach if she had any psychiatric problems.  (AR 113).  Beach testified that she had never received mental health treatment and that she believed she was normal.  (*Id.*).  She added, however, that she was "generally paranoid toward doctors."  (*Id.*).

In a June 2008 report Beach submitted to the Social Security Administration ("SSA"), Beach wrote that she spent most of her days reading.  (AR 193).  She further stated that she sometimes visited her doctors and social workers.  (*Id.*).  She reported that she visited Jan Hus Church to check her mail, make phone calls, and take a bath when possible.  (*Id.*).  Beach explained in the report that while she had been a great walker, she could, at the time of the report, barely walk three blocks to get food.  (*Id.*).  She stated that all walking was painful (to varying degrees), and that both standing and sitting were problematic.  (AR 195).

**B. Beach's Medical History Prior to the Hearing**

On September 10, 2000, Beach sought treatment at New York Presbyterian Hospital ("NYPH") due to a cut she received between her fourth and fifth toes from stepping on an object in the park. (AR 218). The attending physician noted a blister with mild swelling and mild tenderness. (*Id.*). The physician advised Beach to change the dressing on the cut as instructed and prescribed a topical antibiotic. (*Id.*).

On May 9, 2002, Beach again sought treatment at NYPH complaining of burning pain in both feet from the instep through the calf. She reported that the pain had begun two months earlier and that it was worse in her left foot than in her right foot. (AR 221). Beach told the physician that there was no joint swelling, and no numbness, tingling, or weakness in her legs. (AR 222). The physician noted that Beach had no significant past medical history. Beach complained of pain while the physician examined the fibrous tissue of the sole of her foot and when the physician moved her foot toward her lower leg. (*Id.*). Beach was diagnosed with plantar fasciitis and prescribed an anti-inflammatory and heel inserts for her shoes. (*Id.*).[3]

Four months later, on September 14, 2002, Beach returned to NYPH complaining of joint pain and a pain in her foot that she believed was caused by either stepping on a piece of glass or an insect bite. (AR 223). The attending physician removed a calloused papule on the sole of Beach's foot. She reported an improvement of her symptoms thereafter. (AR 224).

Beach was diagnosed with plantar fasciitis a second time (as well as athlete's foot) on April 18, 2003. (AR 225-27). The attending physician noted that Beach's ankles and feet had a full range of motion and that she had a normal gait. (AR 227). Beach was prescribed Motrin

---

[3]    Plantar fasciitis is an inflammation of the tissue on the bottom of the feet. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 687, 692, 1476 (31st ed. 2007) ("DORLAND'S").

and an antifungal cream for her foot condition.  (*Id.*).  She was prescribed the same cream the following year on May 4, 2004, when she returned to NYPH complaining of athlete's foot that had persisted for over a month.  (AR 228-30).

On August 4, 2004, Beach was admitted to the emergency room at NYPH for intermittent fevers over the previous two months and joint pain.  (AR 232).  Beach complained of mosquito bites and asked to be tested for the West Nile Virus.  (AR 233).  She was diagnosed with "malaise."  (AR 234).  The physician observed that Beach's symptoms were likely secondary to perimenopause.  (*Id.*).

Beach returned to NYPH on January 3, 2005, complaining of an earache and buzzing in her ear that lasted two days.  (AR 235).  She also complained of upper respiratory congestion. (*Id.*).  She was diagnosed with an earache in her left ear and prescribed antibiotics and ibuprofen for the pain.  (AR 237).

Beach's next visit to NYPH was on August 11, 2006, when she complained of an itchy rash on her legs, back, and torso.  (AR 238).  The attending physician observed a "scant distribution" of scattered eczematous papules on her lower abdomen and thighs.  (AR 239).  The physician diagnosed her with eczematous eruption secondary to contact dermatitis and prescribed hydrocortisone cream.  (AR 240).

On April 20, 2007, Beach went to New York Hospital – Cornell Medical Center ("NYH-CMC") for further evaluation and management of joint pain.  (AR 281).  She reported pain in her hips (though not at that moment), lower back, left elbow, and ankle (sometimes).  (*Id.*).  She described the pain as diffuse and of a waxing and waning nature.  She said the worst pain was in her left foot but that it improved with aspirin.  (*Id.*).  She also complained of swelling in her foot and leg that improved when she lied down.  (*Id.*).  She denied having any pain in her hands.

(*Id.*).  The physician, Dr. Shahryar Saba, noted that Beach was moderately disheveled with an

odor.  (AR 282).  She had full range of motion in her ankles and hips and there was no evidence

of erythema, swelling, tenderness, or warmth in her ankles or toes.  (*Id.*).[4]  The soles of her feet,

however, had mild erythema and tenderness.  (*Id.*).  The physician's impression was mild

musculoskeletal pain and plantar fasciitis.  Dr. Saba found no evidence of systematic joint

disorder.  (*Id.*).

Beach returned to Dr. Saba on June 18, 2007, complaining of bilateral ankle pain when

she walked and swelling when she walked for long periods of time.  (AR 284).  She requested a

letter stating that she could not work.  (*Id.*).  Dr. Saba observed that Beach was relatively well

groomed, clean, and without odors.  (*Id.*).  Dr. Saba's impression was possible osteoarthritis.

(*Id.*).  He noted, however, that if there was no objective evidence of osteoarthritis, then Beach

was fit for work that did not involve walking.  (*Id.*).

On June 25, 2007, Dr. Saba noted that Beach had not yet obtained imaging of her joints

or seen a rheumatologist.  (AR 286).  He also reported that Beach had agreed to work if she was

able to find a suitable job that did not involve physical labor and was not far from where she

would live.  (*Id.*).  He indicated that she would obtain a Federal Employment and Guidance

Service ("FEGS") form and meet with a social worker to fill it out.  (*Id.*).

Beach underwent a series of x-rays on July 5, 2007.  (AR 287).  The physician, Dr.

Sandra Hall-Ross, noted an impression of "[m]ild osteoarthritic changes of the hip joints[,]

[o]ssific density about the right elbow epicondyle that is likely a non united ossification center or

the sequela of old trauma[,] [l]arge osteophyte about the left talonavicular joint, and productive

---

[4]      Erythema is a redness of the skin produced by congestion of the capillaries.  *See* DORLAND'S at 650.

change at the talonavicular joints bilaterally with sclerosis [(i.e., hardening)] of the navicular bilaterally." (*Id.*).[5] Dr. Hall-Ross stated that the latter changes might be degenerative or might be the result of tarsal coalition. (*Id.*).[6]

Shortly thereafter, on July 16, 2007, Beach went to the Hospital for Special Surgery ("HSS"), reporting pain in her left ankle, right hip, and right elbow. (AR 266). The doctor noted that Beach said the pain had started in her left ankle in the mid-1990s and had evolved to other joints. She stated that she had been experiencing pain since 2000. (*Id.*). The doctor also noted that Beach described the pain as "dull" but said it could worsen to the extent that it precluded movement. (*Id.*). Aspirin reduced or ended the pain, depending on its intensity. (*Id.*). The doctor found no erythema, nodularity, warmth, swelling, or decrease in range of motion in Beach's right elbow. (AR 267). Nor did the doctor find a decrease in range of motion in her hip. A decrease in range of motion was found in her left ankle, however. (*Id.*). Moreover, an examination of her right hand and wrist was positive for Tinel's sign. (*Id.*).[7] Beach was diagnosed with carpal tunnel syndrome, lateral epicondylitis, and hip synovitis. (*Id.*).[8] She was prescribed occupational therapy and the medication Mobic. (AR 267, 271). She was also told to

---

[5]      A sequela is a condition following as a consequence of a disease and an osteophyte is a bony outgrowth or protuberance. *See* STEDMAN'S MEDICAL DICTIONARY 1285, 1622 (27th ed. 2000) ("STEDMAN'S").

[6]      Tarsal coalition is the fibrous, cartilaginous, or bony fusion of two or more of the tarsal bones. *See* DORLAND'S at 383.

[7]      Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve; it indicates a partial lesion or the beginning regeneration of the nerve. *See* DORLAND'S at 1741.

[8]      Epicondylitis is inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus (also known as "Tennis Elbow"). *See* DORLAND'S at 637. Synovitis is an inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, it is the same as arthritis. *See* STEDMAN'S at 1773.

use a right volar resting splint and to return to the clinic in three to four weeks.  (*Id.*).

   While at the hospital, Beach was referred to a social worker who reported that she was alert and oriented, that she appeared well groomed and without odor, and that her "insight" was fair.  (AR 268).  The social worker also observed that Beach's mood appeared anxious.  (*Id.*). The social worker noted that Beach was seeking "section 8" housing (that is, housing pursuant to a federally funded housing assistance program run by the Department of Housing and Urban Development), and reported that Beach said she had friends in Manhattan on whom she "leans." (*Id.*).  Beach requested a medical summary letter from the clinic about the day's visit.  (*Id.*).

   Beach returned to HSS on March 17, 2008, reporting back, arm, and shoulder pain.  (AR 272-79).  The physician diagnosed her with osteoarthritis and right lateral epicondylitis.  (AR 276).  The physician found no synovitis and a full range of motion in the rest of Beach's joints. (*Id.*).  The physician reported that Beach did not use the previously prescribed volar splint and that she was not willing to use it in the future or to try medications or physical therapy.  (*Id.*).  It was also noted that she requested a letter stating that she could not work.  (*Id.*).  The physician recommended the medication Celebrex, physical therapy, occupational therapy, and a volar splint.  Beach declined to accept any of the recommendations.  (AR 276).

   On March 19, 2008, Beach returned to NYH-CMC requesting a letter describing her physical status.  (AR 288).  The physician noted that Beach wished to be on disability because of pain due to carpal tunnel syndrome, epicondylitis, and hip synovitis.  (*Id.*).  She indicated as well that continued physical therapy was recommended, but that Beach felt she could not participate because she was homeless.  (*Id.*).  The physician outlined Beach's status in a letter, but informed her that another evaluation would be necessary regarding disability.  (*Id.*).  The physician stressed that the hospital could not make a decision about Social Security.  (*Id.*).

Beach also saw Dr. Saba, who noted that she was "relatively well groomed although malodorous." (AR 289). He also noted that she reported being unable to participate in physical therapy because she was homeless and that she refused to live in a shelter for fear of abuse and disease. He referred her to a psychiatric clinic for possible post-traumatic stress disorder. (*Id.*).

Dr. Rita Haley, a licensed psychologist, examined Beach on July 3, 2008. (AR 243-46). Beach's presenting complaint was that "most homeless people are depressed in one way or another." (AR 244). She also said she had recently learned from the SSA that her husband had passed away and that she was in mourning. (*Id.*). Beach reported irregular sleep, but a normal appetite. (*Id.*). She stated that her mood had been sad, that she slept all the time and that, while her concentration was adequate, there were no activities that she enjoyed anymore. (*Id.*). She stated that she did socialize with friends, however, and that she enjoyed mosaics, reading, and listening to the radio. (*Id.*). Beach stated that she was only a social drinker and that she used marijuana every day during the summer (two or three puffs) to deal with the heat. (*Id.*).

Dr. Haley observed that Beach was cooperative and that her manner of relating was adequate. (*Id.*). She reported that Beach was casually dressed and adequately groomed and that she made appropriate eye contact. (*Id.*). Beach's speech was fluent and clear, and her thought processes coherent and goal directed. (*Id.*). Dr. Haley reported also that Beach's affect was neutral and her mood pleasant. (AR 245). She rated Beach's cognitive functioning as average or above average, and her insight and judgment fair. (*Id.*). Dr. Haley reported that while Beach's attention and concentration were intact, her recent and remote memory skills were mildly impaired. (*Id.*). Beach could recall three out of three objects immediately and after five minutes, but only five digits forward and three backward. (*Id.*).

In Dr. Haley's opinion, Beach could follow and understand simple directions, perform simple tasks, maintain attention and concentration, and a regular schedule. (*Id.*). She also opined that Beach could learn new tasks and perform complex tasks. (*Id.*). She reported that Beach seemed able to make appropriate decisions and that she could relate adequately with others. (*Id.*). Nevertheless, she stated that Beach had difficulty dealing appropriately with stress. (*Id.*). Dr. Haley stated that Beach's prognosis was "fair" and she recommended vocational training. (AR 246).

Beach also saw internal medicine physician Dr. Aurelio Salon on July 3, 2008. (AR 247-51). Beach stated that she had been depressed since the early 1980s. She reported that she had seen a psychiatrist once at that time but never returned because she had had a bad reaction to the pills she was given. (AR 247). In a mental status screening, Dr. Salon indicated that Beach "dressed appropriately, maintained good eye contact, and appeared oriented in all spheres." (AR 249). He stated that he found no evidence of hallucination or delusions, or of impaired judgment or memory impairment. (*Id.*). He described her affect as normal. (*Id.*).

In terms of physical health, Beach stated that she had had pain in her feet for about eight years and had been told that she had osteoarthritis. (AR 247). She complained of knee pain that spread to her hips, lower back, and hands starting three years earlier. (*Id.*). She stated that because of this pain she had problems walking more than ten blocks, standing more than six hours, or sitting more than six to seven hours. (*Id.*).

Dr. Salon observed that Beach appeared to be in no acute distress. (AR 248). He described her gait and stance as normal. (*Id.*). He reported that she used no assistive devices and was able to rise from her chair without difficulty. (*Id.*). He stated that she needed no help changing for the exam or getting on and off the exam table. (*Id.*). Dr. Salon reported that Beach

had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally.  (AR 249).

Similarly, she had full range of motion of hips, knees, and ankles bilaterally.  (*Id.*).  Her cervical

spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement

bilaterally.  Dr. Salon made similar findings regarding Beach's lumbar spine.  (*Id.*).  He reported

that her joints were stable and nontender, and he observed no redness, heat, swelling, or effusion.

(*Id.*).

Dr. Salon diagnosed Beach with a history of depression, a history of osteoarthritis, and an

asymptomatic heart murmur.  (*Id.*).  He stated that her prognosis was "fair."  Based on Beach's

history and the physical he performed, Dr. Salon stated that there were "no objective findings to

support the fact that [Beach] would be restricted in her ability to sit or stand or in her capacity to

climb, push, pull, or carry heavy objects."  (*Id.*).

On January 23, 2009, Beach sought treatment at a medical center in Key West, Florida,

after falling off a bicycle and injuring her right knee.  (AR 256-62).  The physician noted that she

had abrasions but was ambulating well and independently.  (AR 257, 262).  Beach was further

described as alert and oriented.  (AR 262).  There was no evidence of an acute fracture,

dislocation, or intrinsic bony abnormality.  (AR 261).

Beach sought treatment on July 21, 2009, at Lenox Hill Hospital for pain in her hip joint,

feet, and back.  (AR 291-301).  She rated the pain as a nine on a pain scale.  (AR 291).  An hour

and a half later, she reported the pain as a four, and after another half an hour as a two.  (AR

292).  Beach was examined by Dr. Frank Garrido, who noted no muscle weakness, anxiety, or

depression.  (AR 294).  He observed that Beach was well-nourished, well-developed, and in no

acute distress.  (*Id.*).  He stated that her right hip had a normal range of motion with no

tenderness.  Her ankles also had a full range of motion with no tenderness, swelling, or skin

discoloration.  (*Id.*).  Dr. Garrido performed an electrocardiogram, which was normal.  (*Id.*).  X-rays showed no evidence of bony pathology such as degenerative joint disease.  (*Id.*).  Beach was diagnosed with ankle joint pain and pain in her right hip joint.  (AR 301).  She was prescribed Ultracet for the pain and advised to follow up at the clinic for further evaluations.  (AR 295, 297).

## C.  The Medical Expert Testimony

An orthopedist, Dr. Allan Levine, testified as a medical expert at Beach's administrative hearing.  (AR 120-24).  He stated that, prior to 2005, there was not "enough medical evidence to identify a long-standing medically determinable impairment."  (AR 121).  Dr. Levine noted that, from April 2008 to the date of the hearing, there was a history of bilateral foot pain secondary to osteoarthritis or degenerative arthritis of the feet.  (*Id.*).  He further said that comparing a July 2002 x-ray with a 2007 x-ray suggested that there may have been some degenerative changes of the bones of the feet.  (AR 121-22).  He also noted Beach's diagnosis of mild bone space narrowing and documented complaints of hip pain.  (AR 122).  But Dr. Levine found no objective evidence of any type of disability.  (*Id.*).

Taking into account the evidence of some degenerative arthritis in her feet and ankles, Dr. Levine opined that Beach should be able occasionally to lift thirty pounds and frequently to lift ten pounds.  (AR 123).  He stated that she should also be able occasionally to carry ten pounds.  (*Id.*).  Dr. Levine testified that Beach should be able to stand four out of eight hours and to walk four out of eight hours — although, because of the arthritic changes in her feet, she should not walk longer than thirty minutes at a time.  (*Id.*).  He reported that she should be able occasionally to handle stairs and frequently to kneel, crouch, and stoop.  (*Id.*).  He stated that she should avoid ladders, unprotected heights, heavy vibratory machinery, and exposure to extreme

cold.  (*Id.*).  He noted no limitations in her upper extremities, stating that she had unlimited use of them for both fine and gross movements.  (*Id.*).

 Dr. Joseph Vitolo, a psychiatrist, also testified as a medical expert at the administrative hearing.  (AR 118-20).  He opined, based on the evidence, that Beach had two medically determinable impairments: an affective disorder and a substance addiction disorder.  (AR 118).[9] Dr. Vitolo described each disorder as "a rule-out."  (*Id.*).[10]  Dr. Vitolo did not believe, however, that Beach qualified as disabled *per se* because he concluded that she had no limitation in the activities of daily living.  (*Id.*).  He reported that her social functioning, concentration, pace, and persistence were only mildly limited.  (*Id.*).  Dr. Vitolo stated that Beach was "capable of maintaining attention and concentration, following simple and detailed instructions, following a routine and maintaining a schedule; relating to co-workers and supervisors and functioning appropriately, effectively, and independently."  (*Id.*).  He declined to speculate as to whether she had a personality disorder because there was not enough evidence.  (AR 118-20).

**D.  The Vocational Expert Testimony**

 Finally, a vocational expert, Miriam Green, testified at the administrative hearing.  (AR

---

[9]      In their briefs, the parties report that Dr. Vitolo diagnosed a third "mood disorder" that was not ruled out (Defs.'s Mem. of Law in Support of Mot. for J. on the Pleadings ("Def.'s Mem.") 14; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for J. on the Pleadings ("Pl.'s Opp'n Mem.") 9), but the "mood disorder" appears to be the affective disorder.

[10]      Although it is not clear from the context exactly what Dr. Vitolo meant by the term "rule-out," Defendant defines a "rule out diagnosis" as a "diagnosis which is possible but not established."  (Def.'s Mem. 14 n.10).  This definition is consistent with the ALJ's apparent interpretation of the term.  (AR 93).  *See also*, e.g., *Carrasco v. Astrue*, No. ED CV 10-0043 JCG, 2011 WL 499346, at *4 (C.D. Cal. Feb. 8, 2011) ("In the medical context, a 'rule-out' diagnosis means there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out."); *United States v. Grape*, 549 F.3d 591, 593-94 n.2 (3rd Cir. 2008) (same).

125-27).  The ALJ asked Green to consider a hypothetical person of Beach's age, education, work experience, and language skills, who was capable of performing the following tasks: lifting and/or carrying twenty pounds occasionally and ten pounds frequently; sitting for at least six of eight hours a day; standing and walking for eight hours a day, but no more than four each, and no more than thirty minutes of either at a time without brief rest periods; and occasional stair climbing.  (AR 126).  The ALJ asked Green to assume as well that the hypothetical person would not be capable of climbing ladders, that she should not be in high places where she might fall, and that she should not be exposed to heavy vibrations or extreme cold.  (*Id.*).  The ALJ then inquired whether there were any non-sedentary jobs at the light exertional level that such a hypothetical person could do.  (*Id.*).  Green testified that such a person would be suited for the following positions: customer service, file clerk, box office cashier, locker room attendant, and assembly and packing.  (AR 126-27).  She further reported that there were significant numbers of these jobs available in both the national and local economies.  (*Id.*).

**E.  The ALJ's Decision and Beach's Appeal to the Appeals Council**

On September 30, 2009, the ALJ issued a written decision concluding that Beach was not disabled within the meaning of the Act.  (AR 85-96).  Although he determined that Beach's osteoarthritis in her feet and ankles qualified as a "severe impairment" under the Act, he found that it did not meet the criteria listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P. (the "listing") for qualifying as a disability *per se*.  (AR 95-96).  Dr. Levine, who reviewed the evidence, also found no evidence of a disability *per se* (in part because she did not undergo an "adequate trial of treatment and medication" as required) and opined on Beach's residual functional capacity.[11]

---

[11]    Residual functional capacity is "the most an individual can still do despite his or her physical and/or mental limitations that affect what he or she can do in a work setting."  *Knight v. Astrue*, 10 Civ. 5201 (BMC), 2011 WL 4073603, at *7 (E.D.N.Y. Sept. 13, 2012) (citing 20

(AR 122-23).  The ALJ accepted Dr. Levine's opinion regarding Beach's residual functional

capacity (AR 94), and — based in part on the hypothetical he posed to vocational expert Miriam

Green — determined that Beach could perform certain light jobs.  (AR 94-95).

The ALJ advised Beach that she could file an appeal with the Appeals Council and that

she could submit new evidence for its consideration.  (AR 85-86).  She did both.  In particular,

Beach submitted a FEGS report, x-rays, and medical histories from two doctors: Dr. Emily Stein

and Dr. Norayr Baboumian.  (AR 13-64).  In the FEGS report, dated May 7, 2010, Beach stated

that she had received treatment for depression prior to 1995.  (AR 20).  She indicated that, as of

the date of the report, she felt down, depressed, or hopeless "nearly every day," but that she had a

normal appetite and no trouble concentrating on things such as reading the newspaper or

watching television.  (*Id.*).  The report listed her final diagnosis as "Rt wrist and hip pain,

hyperlipidimia, fatigue, depression."  (AR 30).  The employment disposition stated that Beach

had "Unstable Medical and/or Mental Health Conditions That Require Treatment (A Wellness

Plan) Before a Functional Capacity Outcome Can Be Made."  (*Id.*).  The report noted that Beach

used a cane but was able to walk without it, and that during the interview she had a flat affect

and monotonic voice.  (AR 27, 30).

The x-rays Beach submitted to the Appeals Council were taken at NYU Medical Center

on December 16, 2009, three months after the ALJ's decision.  (AR 56).  Beach had her feet,

spine, and hips x-rayed.  (AR 56-57).  With respect to the foot x-rays, the interpreting physician,

Dr. Jenny Bencardino, noted a marked sclerosis and remodeling of the navicular bone bilaterally,

as well as other bone problems including bone osteonecrosis ("Mueller Weiss Syndrome").  (AR

---

C.F.R. §§ 404.1545, 416.945).

56).[12]  Dr. Bencardino opined that "[t]he findings could be related to chronic nonhealing stress fractures of the navicular bone."  (*Id.*).  With respect to the spine and hip x-rays, Dr. Bencardino noted, among other things, "mild right-sided curvature of the lumbar spine[,] . . . indentation of the vertebral endplates . . . in keeping with a Schmorl node formation," and "mild bilateral sacroiliac joint arthrosis."  (AR 57).[13]  She also made note of mild bilateral hip dysplasia, which was slightly worse on the left side.  (AR 58).

Beach started seeing Dr. Stein, a psychiatrist, on March 4, 2010 — more than five months after the ALJ's decision.  (AR 43).  On April 8, 2010, Dr. Stein reported that Beach presented "with significant depressed mood, hopelessness, passive thoughts of suicide, anxiety, low energy, paranoid ideation and auditory hallucinations."  (AR 38).  Dr. Stein diagnosed Beach with depression, with an onset date of December 2009, and stated that her prognosis was "guarded."  (AR 38).  Dr. Stein drafted a letter to "Whom It May Concern," also dated April 8, 2010, noting that Beach met the criteria for the DSM-IV diagnosis Schizoaffective Disorder, Depressive Type.  (AR 43).  She stated that Beach was being seen every two weeks for follow-up visits and was being treated with Celexa.  (*Id.*).  Dr. Stein opined that Beach was unable to work because of her symptoms, which also included difficulty concentrating, maintaining a schedule, following through on tasks, and anxiety when stressed by appointments.  (*Id.*).  Dr. Stein stated that Beach would be unable to work for one year.  (*Id.*).

In November 2009, more than one month after the ALJ's decision, Beach began monthly visits to Dr. Baboumian.  (AR 49).  In an April 21, 2010 report, Dr. Baboumian diagnosed Beach

---

[12]     Osteonecrosis is bone death due to obstruction of the blood supply.  *See* Dorland's at 1368.

[13]     A Schmorl node is an irregular or hemispherical bone defect in the upper or lower margin of the body of the vertebra.  *See* Dorland's at 1300.  Arthrosis is a generic term for joint disease.  *See id.* at 160.

with fibromyositis. (*Id.*).[14]  He also diagnosed her with leg cramps due to living conditions involving standing and no rest. (*Id.*).  He noted that this led to degenerative joint disease or peripheral vascular disease and "even some stress [fractures]." (*Id.*).  Dr. Baboumian indicated in the report that during a workday, Beach could sit for between zero and two hours continuously and for no more than thirty minutes without alternating position. (AR 50).  He also indicated that, during that time, she could stand and/or walk for between zero and two hours and for no more than ten minutes without stopping to rest. (*Id.*).  He opined that she could occasionally lift or carry between zero and five pounds, never more, and that she could occasionally bend, squat, climb, and reach. (AR 52).  Dr. Baboumian stated that Beach's condition would interfere with her ability to attend work on a regular basis. (*Id.*).

On January 25, 2011, the Appeals Council denied Beach's request for review, making the ALJ's decision the final decision of the Commissioner. (AR 1-3). *See Brown*, 174 F.3d at 61. In its written notice, the Appeals Council explained that it had denied Beach's request because it had "found no reason under [its] rules to review the Administrative Law Judge's decision." (AR 1).  The notice stated that the Appeals Council would review a case if (1) it appeared the ALJ had abused his or her discretion; (2) there was an error of law; (3) the decision was not supported by substantial evidence; (4) there was a broad policy or procedural issue that might affect the public interest; or (5) it received "new and material evidence" and the ALJ's decision was "contrary to the weight of all the evidence now in the record." (*Id.*).  The Appeals Council noted that it had "considered the reasons [Beach] disagree[d] with the [ALJ's] decision" and that it "found that this information [did] not provide a basis for changing the . . . decision." (AR 2).

---

[14]     Fibromyositis is an inflammation of the fibromuscular tissue. *See* DORLAND'S at 711.

## DISCUSSION

### A.  Applicable Law

As noted, this case involves claims for SSI benefits and widow's benefits.  To prevail on her SSI claim, Beach had to establish that she was disabled as of April 30, 2008, the date of her application, through September 30, 2009, the date of the Commissioner's final decision.  To prevail on her widow's benefits claim, Beach had to show that (1) she is the widow of a wage earner who died fully insured; (2) she is at least 50, but less than 60 years old; (3) she is disabled; and (4) her disability commenced within seven years of the month in which the wage earner died.  *See* 42 U.S.C. § 402 (e)(1), (e)(4).  Section 423(d) of the Act sets forth the definition of disabled.  It provides, in relevant part, that the Commissioner will find a claimant disabled if he or she demonstrates the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  Further, the disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

The Commissioner follows a five-step process to determine whether a claimant is entitled to disability benefits.  *See* 20 C.F.R. §§ 404.1520 & 416.920.  The Second Circuit has described the process as follows:

> The first step of this process requires the Secretary to determine whether the claimant is presently employed.  If the claimant is not employed, the Secretary then determines whether the claimant has a "severe impairment" that limits her capacity to work.  If the claimant has such an impairment, the Secretary next

considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations.  When the claimant has such an impairment, the Secretary will find the claimant disabled.  However, if the claimant does not have a listed impairment, the Secretary must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work.  Finally, if the claimant is unable to perform her past relevant work, the Secretary determines whether the claimant is capable of performing any other work.  If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the Secretary to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A district court may set aside the Commissioner's determination that a claimant is not disabled, however, "only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)) (internal quotations marks omitted).  "Substantial evidence is 'more than a mere scintilla.'"  *Brault v. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  "It means such *relevant* evidence as a *reasonable* mind might accept as adequate to support a conclusion."  *Id*. at 447-48 (internal quotation marks omitted).  It is a "very deferential standard of review — even more so than the 'clearly erroneous' standard."  *Id.* at 148 (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999)).  Once the ALJ finds facts, the Court can only reject them if "a reasonable factfinder would *have to conclude otherwise*."  *Id.*  (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

The inquiry is based on the entire administrative record, including any new evidence

submitted to the Appeals Council following the ALJ's decision.  *See Perez*, 77 F.3d at 45; *see also* 20 C.F.R. § 404.970(b) (allowing a claimant to submit "new" evidence to the Appeals Council); *id.* § 416.1470(b) (same).  This is the case even where, as here, the Appeals Council denies review of the ALJ's decision and the ALJ's decision is therefore the Commissioner's final decision for purposes of judicial review.  *See Perez*, 77 F.3d at 44-45.  That is because "when the Appeals Council denies review after considering new evidence, the [Commissioner's] final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence."  *Id.* at 45 (internal quotation marks omitted).  Thus, when, as in this case, the Appeals Council denies review after considering new evidence, the Court "simply review[s] the entire administrative record, which includes the new evidence, and determine[s], as in every case, whether there is substantial evidence to support the decision of the [Commissioner]."  *Id.* at 46.

**B.  Beach's Claim for Widow's Benefits**

Applying these principles here, Beach's challenge to the Commissioner's denial of her claim for widow's benefits is easily rejected.  Because Beach's husband — the  wage earner for the purposes of her widow's benefits claim — died in January 1998 (AR 101), she had to establish that her disability commenced before January 2005 to qualify for benefits.  *See* 42 U.S.C. § 402 (e)(1), (e)(4).  Substantial evidence exists in the record to support the ALJ's determination, at step two of the five-step process, that she failed to do so.  (AR 95).  As the ALJ noted, Beach "had virtually no relevant medical treatment — even marginally — between 2000 and 2007."  (AR 91).  Moreover, of the seven occasions on which she sought treatment before January 31, 2005, only two were primarily about joint pain and, on those occasions (in May 2002 and April 2003), she was diagnosed with plantar fasciitis and prescribed an anti-inflammatory

and heel inserts.  (AR 221, 225-27).  On the basis of this record, Dr. Levine testified as an expert

at the hearing that there was not enough medical evidence to identify a long-standing medically

determinable impairment beginning on or before January 2005.  (AR 121).

Given the foregoing record developed at the hearing, the ALJ had ample basis to reject

Beach's claim for widow's benefits.  Further, the evidence Beach submitted to the Appeals

Council after the hearing does nothing to cast doubt on the Commissioner's final determination.

The new evidence describes Beach's condition from November 2009 to May 2010, roughly five

years after the date before which Beach needed to establish the presence of a disability.  Given

the scant evidence that Beach was suffering from a disabling condition prior to January 2005, the

ALJ had substantial evidence to conclude that she was not disabled, even if, five years later,

there was evidence that she had developed a more serious condition.  Considering the record as a

whole, the Court concludes that the ALJ's decision regarding Beach's claim for widow's benefits

was plainly supported by substantial evidence.

## C.  Beach's Claim for SSI Benefits

Beach's challenge to the Commissioner's denial of her claim for SSI benefits requires

more extended discussion, but it too fails.  Notably, Beach does not appear to dispute that there

was substantial evidence in the record as it existed at the time of the hearing before the ALJ on

September 10, 2009, to support the ALJ's denial of her claim.  Instead, she makes three

arguments that the ALJ's decision was affected by legal error.  First, she contends that the ALJ

erred in not developing the record, on the ground that he failed to consider the evidence that she

submitted to the Appeals Council and failed to follow up on evidence of memory impairment.

(Pl.'s Opp'n Mem. 12-14 (Docket No. 19)).  Second, she alleges that the ALJ failed to pose an

accurate hypothetical to the vocational expert.  (Pl.'s Opp'n Mem. 14-15).  And third, she asserts

that the ALJ violated the "treating physician rule," principally by failing to give proper weight to the opinions of Dr. Stein.  (Pl.'s Opp'n Mem. 15-17).  These arguments do not survive scrutiny.

Beach's first argument — that the ALJ failed to develop the record — is easily rejected. It is true that Beach appeared at the hearing *pro se* and that an ALJ has an affirmative duty to "adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered."  *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (internal quotation marks omitted).  But "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).  Here, there were no such "obvious gaps."  The Commissioner properly sought and received records from the medical sources that Beach listed in her application (AR 171, 252, 255, 263, 280), and the ALJ issued subpoenas to Beach's treating sources.  (Reply Mem. of Law in Further Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Reply Mem.") 4 n.1 (Docket No. 21)).  Further, in an effort to fill in any gap in Beach's mental health records, the Commissioner sent Beach to be examined by consulting psychologist Dr. Haley.  (AR 243-46).  Dr. Haley did describe Beach's memory as "mildly impaired," but she diagnosed no mental condition and opined that Beach was capable of learning new tasks, performing complex tasks, and keeping a regular schedule.  (AR 245).  The ALJ was under no duty to do more than all that, and certainly cannot be faulted for failing to admit the evidence Beach submitted later to the Appeals Council, which did not exist at the time of the hearing and which became a part of the record in any event.  *See, e.g.*, *Perez*, 77 F.3d at 44-46.

Beach's second argument — that the ALJ failed to provide the vocational expert with a complete and accurate description of her impairments — also fails.  Beach contends that the ALJ

failed to include in his hypothetical "any limitations pertaining to memory or concentration problems that plaintiff may have . . . ." (Pl.'s Opp'n Mem. 15). But, again, there was little or no evidence in the record to establish such memory or concentration problems. Dr. Haley did opine that Beach's recent and remote memory skills were "mildly impaired" (AR 245), but she also stated that Beach's attention and concentration were intact, that she could follow and understand simple directions, perform simple and complex tasks, maintain a regular schedule, make appropriate decisions, and relate adequately with others. (AR 245). Dr. Levine and Dr. Vitolo also reviewed the evidence and offered testimony that was consistent with the ALJ's hypothetical. (AR 93-93, 118, 121, 125-26). In short, the ALJ's assessment of Beach's residual functional capacity was based on substantial evidence. It follows that posing a hypothetical question to the vocational expert based on that assessment was not error. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Finally, there is no merit to Beach's contention that the Commissioner violated the "treating physician rule." Pursuant to that rule, "the report of a claimant's 'treating' physician is entitled to a degree of deference. . . . [An] ALJ [is] required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). Even giving the opinions of Dr. Stein and Dr. Baboumian controlling weight, however, there is substantial evidence in the record to support the Commissioner's decision in Beach's case. First, although Dr. Stein opined that Beach met the criteria for Schizoaffective Disorder, Depressive Type, her report indicated that Beach's condition began in December 2009 — more than two months *after* September 30, 2009, the date of the ALJ's decision and the relevant cutoff date. (AR 39). Further, there is little or no other

evidence in the record that she was suffering from depression before that date that might be bolstered, *post hoc*, by Dr. Stein's opinion.  To the contrary, the record is full of representations by physicians and social workers that Beach was "alert and oriented" (*e.g.*, AR 219, 223, 225, 235, 279), and that her mood and affect were normal, within normal limits, or pleasant (*e.g.*, AR 226, 233, 236, 245, 249).[15]  Moreover, Beach herself testified that she had not had any mental health treatment in the past and that she tended to think of herself as normal.  (AR 113).

Beach does not expressly invoke the "treating physician rule" with respect to the opinions of Dr. Baboumian, but those opinions do not call for disturbing the Commissioner's decision either.  Dr. Baboumian's diagnosis — that, as of April 2010, Beach was suffering from fibromyositis and leg cramps leading to degenerative joint disease, peripheral vascular disease, and "even stress [fractures]" (AR 49) — and the x-rays Beach submitted from December 2009 are certainly more probative of whether Beach was disabled during the relevant time period than Dr. Stein's diagnosis.  After all, they corroborate the ALJ's finding that Beach had osteoarthritis and complement it with additional evidence of, among other things, possible unhealing stress fractures and Mueller Weiss syndrome, any or all of which may have been present prior to September 30, 2009, the relevant cutoff date.  *See, e.g.*, *Pollard v. Halter*, 377 F.3d 183, 193-194 (2d Cir. 2004) (observing "that evidence bearing upon an applicant's condition subsequent to the [relevant] date . . .  is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the [relevant] date or may identify additional impairments which could reasonably be presumed to have been present . . . ."); *Brown*, 174 F.3d at 64-65 (holding that diagnosis of severe seizures after the relevant time period might have a bearing on the

---

[15]     Dr. Salon did note that Beach had been "depressed since the early 1980s" (AR 247), but he also stated that she had seen a psychiatrist only once during that time period and that she had had no psychiatric follow up.  (*Id.*).

claimant's disability status during relevant time period).

Nevertheless, considered in light of the record as a whole, this evidence is more likely a reflection of Beach's condition worsening after the cutoff date than an indication that she was disabled prior to the cutoff date.  Although the new evidence supports Beach's reports of joint pain in her ankles and hip, the ALJ never discounted those subjective claims or questioned her credibility.  To the contrary, he took into consideration Beach's testimony and gave her "the benefit of the doubt," by concluding that her foot and ankle arthritis caused the limitations outlined by Dr. Levine.  (AR 94).  Further, while Dr. Baboumian opined that, as of April 2010, Beach could continuously stand, walk, or sit for only between zero and two hours (AR 50-51), Beach herself stated at the administrative hearing that she was capable of sitting for two to three hours before having to put her feet up, standing for two to three hours with effort, and that she could walk ten to twenty blocks.  (AR 111).  In short, the new evidence does not give reason to conclude that the ALJ misapprehended the true nature of Beach's condition; it provides reason to conclude that Beach's condition grew worse in the months and years after she testified at the hearing.  That is not a basis to disturb the ALJ's decision, which is supported by substantial evidence.  *See, e.g.*, *Vilardi v. Astrue*, 447 Fed. Appx. 271, 272 (2d Cir. 2012) (summary order) (concluding that "reliance on evidence demonstrating a worsening of [claimant's] condition" was of "little value" because it occurred after the date that she was required to demonstrate that she was disabled).

## CONCLUSION

The Court has reviewed the entirety of the record, including the evidence Beach submitted to the Appeals Council, and concludes that the ALJ's decision was free from legal

error and is supported by substantial evidence.  Accordingly, the Commissioner's motion for judgment on the pleadings is GRANTED and Beach's cross-motion is DENIED.


SO ORDERED.

Dated: August 2, 2012
New York, New York

JESSE M. FURMAN
United States District Judge